**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **PABLO ALVARADO,** ██████████████ | |
| | **REDACTED** |
| **INGRID MUÑOZ,** ██████████████ | |
| | Case No.: _____ |
| **ELIZABETH GALLEGOS-TORRES,** ████████ **and** | **JURY TRIAL DEMANDED** |
| **NATALIA PELAEZ-TORRES,** ██████████████ | |
| **Plaintiffs,** | |
| v. | |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

## COMPLAINT

1.     Plaintiffs Pablo Alvarado, Ingrid Muñoz, Elizabeth Gallegos-Torres, and Natalia Pelaez-Torres (collectively, "Plaintiffs") bring this Complaint for damages pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, and for declaratory and injunctive relief for violations of their rights under the Fourth and Fifth Amendments to the United States Constitution.

2.      In the early morning hours of June 30, 2008, agents of the United States Department of Homeland Security's ("DHS") Immigration and Customs Enforcement component ("ICE"), and Anne Arundel County and Annapolis City police officers acting on behalf of ICE via a federal-local cooperation program, conducted illegal raids of the two homes in which the Plaintiffs lived.  The raids were part of an action that ICE called "Operation Touch Up."  The raid of the home of married couple Pablo Alvarado and Ingrid Muñoz was unlawful because it was conducted without a warrant, consent, or any valid exception to the warrant requirement.  The raid of the home of sisters Elizabeth Gallegos-Torres and Natalia Pelaez-Torres was unlawful because it was conducted pursuant to a facially defective warrant lacking in requisite particularity and unsupported by probable cause as to Elizabeth Gallegos-Torres or Natalia Pelaez-Torres, without consent, and without any valid exception to the warrant requirement.  Once they were in Plaintiffs' homes, Defendant's agents used unreasonable and excessive force, deprived Plaintiffs of procedural and substantive due process, and committed multiple torts, including battery, assault, sexual assault, intentional infliction of emotional distress, trespass, false imprisonment, invasion of privacy, and negligence against the various Plaintiffs, causing them severe emotional distress and other serious and lasting injuries.

3.      A United States Immigration Judge, ruling in a case involving the Plaintiff sisters, found that Defendant's agents committed "egregious" constitutional violations in the course of the raid.  *See In re Gallegos-Torres; In re Palaez-Torres* (Baltimore, Md. Immigr. Ct. Aug. 5, 2010).  This decision is attached hereto as Exhibit A.

4.      As described more fully below, the raids on Plaintiffs' homes were part of a pattern and practice of abusive and illegal actions by ICE agents, which have been noted by numerous complaints filed in federal court and even by the United Nations Special Rapporteur on the Human Rights of

Migrants, which reported: "Increasing workplace and household raids by ICE agents have terrorized immigrant communities" and been characterized by "their frequent disregard of due process."[1]

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action and over the parties pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

6.     Venue is proper in this Court because the acts complained of occurred in the city of Annapolis, Maryland and surrounding areas of Anne Arundel County, Maryland.

7.     On June 29, 2010, Plaintiffs filed claims with DHS pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, alleging that during the June 30, 2008, raid on Plaintiffs' homes, agents and officers acting in their official capacity under color of federal law committed tortious, abusive, and illegal acts, causing Plaintiffs serious and lasting injuries.  Nearly one year has passed since Plaintiffs filed these claims, and DHS has yet to provide Plaintiffs with final determinations of their claims. Plaintiffs have thus exhausted all administrative remedies.

## PARTIES

8.     Plaintiff Pablo Alvarado is a 37-year-old man who at the time of the June 30, 2008, raids resided, along with his wife Ingrid Muñoz and their children, in the home they owned located at 1A First Street, Annapolis, MD 21401.

---

[1] *See* UN Human Rights Council, *Report of the Special Rapporteur on the human rights of migrants, Jorge Bustamante: addendum: mission to the United States of America*, 5 March 2008, A/HRC/7/12/Add. 2, at 16, *available at* http://www.unhcr.org/refworld/docid/47d647462.html.

3

9.      Plaintiff Ingrid Muñoz is a 43-year-old woman who at the time of the June 30, 2008, raids resided, along with her husband Pablo Alvarado and their children, in the home they owned located at 1A First Street, Annapolis, MD 21401.

10.     Plaintiff Elizabeth Gallegos-Torres is a 36-year-old woman who at the time of the June 30, 2008, raids resided at 3 Rosecrest Drive, Annapolis, MD 20912 in a rented room she shared with her sister Natalia Pelaez-Torres.

11.     Plaintiff Natalia Pelaez-Torres is a 42-year-old woman who at the time of the June 30, 2008, raids resided at 3 Rosecrest Drive, Annapolis, MD 20912 in a rented room she shared with her sister Elizabeth Gallegos-Torres.

12.     Defendant the United States of America conducted the June 30, 2008, raids through its agents DHS, DHS employees, and local officials – all who are law enforcement officers of the United States and acted at all relevant times in their official capacities and under color of federal law.

## STATEMENT OF FACTS

### A. Operation Touch Up

13.     On June 30, 2008, beginning shortly before 6:00 a.m., approximately 75 ICE agents and 50 Anne Arundel County police officers raided at least 17 homes in and around Annapolis, Maryland, and the business offices of Tempo, Inc. – a corporation doing business as Annapolis Painting Services ("APS"). These raids were conducted as part of "Operation Touch Up," an investigation into APS and its owner Robert T. Bontempo, Jr., whom ICE agents apparently suspected of employing undocumented workers, harboring them at residences he owned, failing to pay overtime, and money laundering.

14.     Defendant's agents are law enforcement agents of the United States, and the particular actions at issue here were not discretionary and were not susceptible to policy analysis.  Rather, these actions occurred at the operational level and were in violation of mandatory federal law.

15.     Defendant's agents had no warrant to search six of the 17 homes they raided on June 30, 2008.  For the remaining homes and the offices of APS, they relied on a single criminal warrant naming only Mr. Bontempo and APS as the targets.  This warrant did not identify any other individuals by name or description.  Rather, under the heading "Items to be Seized," it listed not only documents, photographs, payroll records, and the like, but also "[a]liens present in the United States without legal authority."[2]  Like the warrant itself and its attachments, the affidavit submitted in support of the warrant, which was detailed in other regards, failed to name or describe any of the Plaintiffs.

16.     Launching their raids on the 17 homes in the early morning hours of June 30, 2008, Defendant's agents set out in teams, surrounded the individual homes, and began shouting and banging on doors, demanding entry.  Upon gaining entry, they detained the occupants of the homes for questioning, without regard to whether the individuals could be identified based on any description in the warrant, without regard to whether they had any connection to APS, and without regard to whether the officers had a warrant, consent, or any exception to the warrant requirement.  Many of the occupants of the homes were then arrested and transported under unsafe conditions to detention facilities, including jails in various locations throughout Maryland and some as far as Texas.  The particular experiences of the four Plaintiffs are set forth in detail below.

_____

[2] *See* Search Warrant, *In re the Search of Annapolis Painting Services 2561 Housley Road, Annapolis, MD 21401*, No. 08-1863 (D. Md. June 24, 2008) (Bredar, M.J.).  The warrant is attached hereto as Exhibit B.

**B. Raid on Home of Pablo Alvarado and Ingrid Muñoz and Further Detention and Intimidation of Pablo Alvarado**

**(1) <u>Warrantless and Unconsented Forcible Entry into Pablo and Ingrid's Home</u>**

17.     At the time of the June 30, 2008 raids, Pablo Alvarado, a United States lawful permanent resident, his wife Ingrid Muñoz, a United States citizen, and their six-year-old son were asleep in the Annapolis, Maryland home they owned.  No warrant existed that identified Pablo and Ingrid's home or any of its residents.

18.     At approximately 6:00 a.m., several ICE agents, accompanied by local officers acting on behalf of ICE, awoke the couple by pounding and yelling at their front door.

19.     Ingrid got up to investigate, and through the hallway windows she saw several individuals outside her home.  A large man was pounding on the door and repeatedly shouting, "Come outside!"  Shocked and frightened, Ingrid ran back to her bedroom to get her husband, as the pounding and yelling continued.  Other agents standing outside were also yelling for the couple to come outside.

20.     Pablo got out of bed and ran to the door.  When he opened the door, he saw a number of individuals, including three men wearing black pants, black t-shirts, and vests that read "ICE" on the back (a term that Pablo did not recognize).  All of the individuals were wearing guns on their belts.  At no point did any of the individuals provide identification or show a badge or search warrant.  In fact, they had no search warrant.

21.     The large ICE agent at the door identified Pablo by name and demanded repeatedly that he come outside.  When Pablo said no and asked why he was being told to come outside, the agent did not answer and simply repeated his demand that Pablo come outside.

22.     The large ICE agent then threatened:  "Come outside, or we're coming in."

23.     Pablo and Ingrid had been awakened so abruptly that they were still wearing only their underwear when confronted with this demand.  Specifically, Pablo was wearing nothing but briefs, and Ingrid was wearing only underwear and a bra.  Going outside in such a state of undress would have been so humiliating that it was not an option, especially because many of the couple's neighbors were also outside – some whose home had been raided (also without a warrant) by the same officers just moments before, and others who had gone outside in response to all the noise.

24.     Ingrid found the force of the pounding and yelling so aggressive that she feared imminent physical abuse by the agents.  She quickly ran and grabbed a towel with which to cover herself.

25.     Although Pablo refused to go outside, he was frightened by the agents' show of force.  Acting under duress, Pablo finally stood aside and allowed the agents to enter his home.

26.     Four ICE agents immediately rushed inside, and two of them ran past Pablo and Ingrid and down to the basement.  The couple noticed through their windows that agents had in fact surrounded their home, as some were now moving from the backyard to the front of the house.

**(2) First Illegal Detention**

27.     While two agents searched throughout Pablo and Ingrid's home without their consent, two other agents demanded that Pablo and Ingrid sit down on the couch in the living room.  Pablo asked the large male agent if he could put some clothes on, but the agent said no.

28.     A female agent, who was not wearing any sort of uniform but appeared to be in charge, immediately started interrogating the couple.  She said the agents were looking for "illegals" and asked who else lived there.  Pablo mentioned his six-year-old son, who was sleeping.  Pablo and Ingrid's three older children who lived at the home were out of town at the time.  Responding to the agent's demand,

7

Pablo showed him the sleeping son's room.  There, Pablo again asked if he could put on some clothes but was again refused.

29.     When Pablo returned to the living room, the agents began to interrogate him about his employer, APS, and its owner Robert Bontempo, Jr.  The agents' manner of interrogation was forceful, intimidating, and aggressive.  Ingrid could see the look on her husband's face, and she had never seen Pablo so scared.  The agents told him:  "We know everything about you and have your papers."

30.     The agents were unresponsive to Pablo's pleas that English was not his first language, and they refused to allow him to speak with his wife in Spanish when he sought her help to communicate with them.  Instead, the large male agent took Pablo by the arm and forcibly pulled him into the kitchen.  A chair was placed in the middle of the kitchen, where the agents sat Pablo down with the large agent on one side, another agent on the other side, and the female agent in front of him.

31.     Another male agent stayed with Ingrid in the living room, ordering her to stay on the couch and not allowing her to move.  He denied her requests to put on more clothes beyond the bra, underwear, and towel she had on when the agents barged into the house.

32.     Ingrid asked the agents if they wanted to see her identification or any other documentation, but they said no.  They refused to answer her questions about why they were there, and they never identified themselves throughout the time they were present in her home.  Instead, the agents continually whispered to each other, and the agent with Ingrid continued asking questions about who lived in the house.

33.     After her interrogation was complete, Ingrid remained where she was, not feeling free to leave, while the agents remained in the house and kept Pablo in the kitchen.

34.     The agents in the kitchen continued to aggressively interrogate Pablo about APS.  Pablo insisted repeatedly that he did not know English well and turned to look at his wife in the living room. The large agent then used his hand to force Pablo's face away from Ingrid's direction, and told Pablo not to look at her.

35.     Throughout the interrogation, Pablo could hear his phone ringing repeatedly in the bedroom.  At one point he asked if he could go answer it, but the same agent refused to let him do so.

36.     Notwithstanding Pablo's continued protestations regarding his limitations with the English language, the agents forced him to sign some papers written in English, which Pablo did not understand.  They refused to explain what he was signing.  Pablo signed because he was in shock, could not talk to his wife, and felt he had no choice.

37.     The agents then gave Pablo the phone number for the prosecutor in Mr. Bontempo's criminal case and told Pablo:  "You better contact him as soon as possible if you don't want to be in trouble."  The agents then left, having detained Pablo and Ingrid for approximately 30 to 45 minutes.

38.     Throughout the entire invasion of Pablo and Ingrid's home, Defendant's agents never showed them a warrant to enter or search their home or to detain them.  Nor did Pablo or Ingrid ever consent to these actions.  Given the coercive show of force and intimidation by the ICE agents, Pablo and Ingrid did not at any time feel free to leave the agents' custody.

### (3) "I can take away your green card at any time": Second Illegal Detention, Coercion by Threats, and Intimidation of Pablo Alvarado

39.     After the agents left the couple's home, Pablo, still in shock, tried calling his APS co-workers to find out what was going on.  Pablo could not get in touch with anyone, however, so he dressed for work and drove to the APS offices.

40.     When Pablo arrived at the APS offices, there were between 20 and 30 officers in the immediate area, including local police officers and ICE agents.  Among them was the large male agent who had been in Pablo's home.  Pablo observed that many of his friends from work had been arrested and were being loaded into white passenger vans.

41.     Pablo was approached by two men who introduced themselves as agents from the Internal Revenue Service (IRS).  The introduction was interrupted by another man who approached Pablo, pointed into Pablo's face, and threatened:  "You better tell the truth to these guys, because I can take away your green card any time."  Fearful of this threat and not wishing to cause any trouble, Pablo felt he had no choice but to obey and cooperate with this man and the IRS agents.

42.     As the other man continued to scream at and intimidate Pablo, shouting that he had Pablo's "folder," the IRS agents took Pablo to an office, where they interrogated him about his coworkers.

43.     As soon as the IRS interrogation was over, the man who had threatened Pablo showed up in the office and asked the IRS agents:  "Are you finished with this guy?"  The agents said yes, and the man ordered Pablo:  "Come with me."  Having no choice and fearing he was joining his friends in being taken away, Pablo followed the man away from the office.  The man forced Pablo into what appeared to be an unmarked police vehicle.  It was a light green Ford Crown Victoria, with siren lights in the back and a police radio inside.

44.     Inside the car, the man identified himself as ICE Agent Frank O'Connor, and he proceeded to interrogate Pablo about APS.  Agent O'Connor's tone was threatening, and he reiterated that he would take away Pablo's green card if Pablo did not cooperate.  At one point, Agent O'Connor left the car for a few minutes and stationed an officer outside the car so that Pablo could not leave.  At

another point, a man who appeared to be Agent O'Connor's superior came to the car.  Agent O'Connor rolled down the window and assured the man that Pablo would be cooperating.

45.     Agent O'Connor had apparently noticed that Pablo had a tattoo honoring the memory of a son who had died, and referred to that son in demanding Pablo's cooperation.  Pablo was horrified and offended by this.

46.     Throughout Agent O'Connor's interrogation, Pablo feared for his safety and did not feel free to leave.  Finally, after about 15 minutes, Agent O'Connor told Pablo that he could go.  Pablo exited the car and called his manager, who told him to go home.

### (4) Impact on Pablo and Ingrid

47.     The unlawful acts of Defendant's agents described above have caused both Pablo and Ingrid to suffer significant emotional distress, including depression and anxiety.  Since the events of June 30, 2008, Pablo has suffered from loss of appetite, chest pains, and upset stomach.  At times he cries for the slightest reason, and he is sometimes unable to perform routine tasks or household chores. As a result of the raid, Ingrid experiences insomnia, stress headaches, and anxiety attacks during which she suffers chest pains.  Not a day goes by that she does not think about the raid.  Both Pablo and Ingrid have been seeing and continue to see a psychotherapist for treatment of these conditions and have been taking prescription medication.  Upon information and belief, it is anticipated that, in addition to their current treatment, Pablo and Ingrid are both in further need of psychotherapy.

48.     The raid also exacerbated the effects of what was already a difficult time for Pablo and Ingrid.  Before the raid, Pablo and Ingrid were recovering from depression connected to the loss of a son as stillborn in October 2006.  The raid deepened their depression, and they have suffered from increased anxiety.  The raid and its aftereffects have also caused a strain on their marriage.

49.     By forcing their way into Pablo and Ingrid's home, Defendant's agents destroyed their sense of privacy and security.  Pablo and Ingrid no longer felt safe within their own home.  In particular, Ingrid has had trouble sleeping since the raid.  Until she and Pablo recently moved to a quieter residence, any noise would easily startle and wake her, and when she heard a loud noise she would wake up thinking her home was being raided again.  Even during the day, she was easily frightened by loud knocks, such as from delivery companies.

50.     Pablo has lost faith in the protections of the United States Constitution and feels that he has no rights.  He now lives in constant fear that he will lose his green card and that ICE agents, and in particular Agent O'Connor, can do anything they want to him.  Pablo is withdrawn and reluctant to go out, especially to places where there might be other Hispanics.  He is constantly stressed and never stops thinking about his immigration status.

C.     **Raid on the Rented Bedroom of Elizabeth Gallegos-Torres and Natalia Pelaez-Torres, Sexual Assaults on Elizabeth, and Further Transfers and Detention**

(1) **Illegal Entry Based on Facially Defective Search Warrant**

51.     On June 30, 2008, Plaintiff Elizabeth Gallegos-Torres and her sister, Plaintiff Natalia Pelaez-Torres, were living in a small rented bedroom they shared at 3 Rosecrest Drive, Annapolis, Maryland 20912, when, at approximately 5:45 a.m., they were awakened by the sound of banging on the front door of their residence.

52.     Elizabeth and Natalia had moved into their room at 3 Rosecrest Drive just a few months before the raid, after responding to an advertisement for rooms to rent posted on the wall at a store.  Elizabeth and Natalia sublet their room from another individual who lived in the house.  They did not know who owned the house.

53.     Elizabeth and Natalia were not APS employees, had never heard of APS or Mr. Bontempo, and lacked any connection to the targets of the investigation.

54.     The warrant upon which Defendant's agents purported to rely in conducting the raids on June 30, 2008 did not identify Elizabeth or Natalia, either by name or description.  The warrant thus lacked the requisite particularity as to them and was facially defective.  The affidavit in support of the search warrant identified some individuals but did not identify Elizabeth or Natalia or show probable cause to believe that they – or even anyone potentially fitting their description – had committed any unlawful acts.

55.     Soon after being awakened by banging on the doors of the residence, Elizabeth and Natalia heard people shouting in their living room, banging on the doors of the adjacent bedrooms, and then loudly pounding on their own bedroom door.  After someone shouted in English something unintelligible to the sisters, a female voice shouted in Spanish, "Open the door!"

56.     Natalia stood shaking in fear while Elizabeth unlocked the door and cracked it open to see what was going on.  As soon as she did this, two people burst into the room, shining flashlights at Elizabeth and Natalia.  Neither Elizabeth nor Natalia ever gave consent for these individuals to enter the room.

57.     One of these intruders was a woman dressed in a blue uniform of no apparent affiliation, and the other person was a man in khaki-colored pants and a nondescript t-shirt.  These intruders did not identify themselves, nor did they show either of the sisters a search warrant.

58.     Both sisters wore only scant nightclothes.  Elizabeth was dressed in short shorts for sleeping and a t-shirt, and Natalia was wearing a tank top and short shorts, though she was permitted to put on a t-shirt over her top.

### (2) The First Sexual Assault

59.     The female agent entered the bedroom and moved toward the right, approaching Natalia. The male agent entered immediately after the female agent and pushed Elizabeth with enough force to send her falling backward onto her bed, which was on the left side of the room.  As Elizabeth was falling, she heard the click of the latch as the male agent closed the bedroom door behind him.  Both agents stood in the small area between the bedroom door and the feet of the beds, blocking the only exit from the room.

60.     The sisters were frightened for their own – and one another's – safety.  Because of the way the agents had pounded on their door and then barged in uninvited, Elizabeth and Natalia were fearful that these people would physically harm them if they attempted to exit.  Elizabeth and Natalia did not feel free to leave.

61.     As the male agent pushed Elizabeth backward onto her bed and shut the bedroom door behind him, Elizabeth turned and instinctively reached out for her cellular phone, which was lying on her bed.

62.     Suddenly, from behind, she felt the male agent cup and grab her genitalia.  Shocked, Elizabeth spun around to face him.  She was humiliated and shaking with fear, and she knew there was no reason for him to grab her as he did.

### (3) Initial Coercive Interrogation

63.     Still not having produced any warrant or having identified themselves or their affiliation, Defendant's agents proceeded to interrogate the detained sisters, asking where they were from and why they were in the United States.  Having already been physically restrained, assaulted, and sexually

attacked in Elizabeth's case – and seeing the position of the agents blocking the only exit – the sisters felt confined and compelled to answer the questions they were asked.

64.     The female agent then ordered the sisters to get up, and both agents escorted them to the living room.  There the sisters saw each of their four housemates seated, and they were ordered to sit on the couch with them.  They saw four agents in total in the living room, but the sisters still did not know who they were or what was going on.  Elizabeth started to cry and again asked what was happening.  No one answered.  The sisters were then put in handcuffs, which were attached to some sort of chain belt around their waists.  The other housemates were detained in the same manner.

65.     Natalia eventually asked to use the bathroom.  The female agent accompanied her to the bathroom, removed her handcuffs, and told her to sit down.  The female agent did not close the door to the bathroom, and while Natalia was using it, the same male agent who had attacked Elizabeth in the bedroom looked over and watched Natalia sitting on the toilet.  After Natalia finished, the female agent reapplied the handcuffs and, without letting her wash her hands, took her back to the living room.

66.     After some time, the sisters could no longer bear being in front of so many strange people while wearing such scant clothing.  Elizabeth and Natalia asked permission to change clothes.  The female agent agreed, and both she and the male agent accompanied the sisters back into their bedroom.

67.     Elizabeth and Natalia's handcuffs were removed, and the sisters were told to change quickly.  The female agent then said something to the male agent, which Elizabeth understood to be an instruction that he leave, based on her interpretation of the female officer's gestures and facial expressions.  The male agent stepped toward the door but did not exit.  Because the sisters had been instructed to act quickly, they continued changing.  The female agent again said something to the male agent, who then moved to the threshold of the bedroom, all the time watching Elizabeth and Natalia as

15

they changed.  Elizabeth noticed his gaze and felt extremely uncomfortable.  The sisters finished

changing quickly out of their shorts and into long pants.  Elizabeth also grabbed some money – paper

bills –  and put it into the back pocket of her jeans.

### (4) The Second Sexual Assault

68.     The male and female agents then took Elizabeth and Natalia out of their bedroom into the

living room in a single-file line, with Natalia walking first, followed by the female agent, then Elizabeth,

and finally the male agent.  Elizabeth was nervous about having the male agent, who had sexually

assaulted her, walking behind her, where she could not see him.  The female agent walked to another

room, and Natalia continued walking into the living room.  Still in the hallway, Elizabeth heard the male

agent behind her say something in English, which she could not understand.

69.     Suddenly, the male agent grabbed her.  He grabbed her buttocks and patted around the

pockets, which were flat and visibly empty, aside from the few bills of money that he had just watched

her put into her pocket.  He ran his hands to the front of her body, probing between her legs, and then up

the sides of her waist and torso to her breasts.  He cupped her breasts twice slowly, then began to reach

down to the front of her thighs once more.  The officer did not take the money, say a word, or seem to be

looking for anything in particular.

70.     Elizabeth, feeling humiliated, violated, and totally powerless, turned to the male agent,

told him in Spanish "I have nothing," and showed him the bills of money in her pocket.

71.     Elizabeth was crying when she got back to the living room.  Natalia asked whether the

agent had touched her, but Elizabeth was too upset to respond.  After more time sitting handcuffed in the

living room, Elizabeth asked the female agent if she could get a sanitary pad.  The female agent escorted

her to her bedroom to retrieve one, and then to the bathroom located directly off the front room.  The

male agent followed the entire time, watching Elizabeth.  The female agent went inside the bathroom with Elizabeth but left the door ajar and stood facing Elizabeth, with her back to the open bathroom door, while Elizabeth removed her pants and underwear and affixed a sanitary pad to her underwear. While situating the sanitary pad, Elizabeth looked up and saw the same male agent leaning against a piece of furniture and leering at her.  She hurriedly finished and, without being allowed to wash her hands, went back to the living room where she was handcuffed once again.

### (5) Second Coercive Interrogation

72.     Back in the living room, Defendant's agents compelled Elizabeth and Natalia to answer questions about their alienage, the names of their parents, and other questions.  The interviewing officer demanded that they produce identification.  Because of the events of the morning, Elizabeth and Natalia felt compelled to respond to avoid any repercussions.

73.     Defendant's agents used the information they coerced from Elizabeth and Natalia during both interrogations to effect the sisters' further unlawful arrest and prolonged detention for 62 days in facilities across three different states.

### (6) Transfer to Immigration Office

74.     At approximately 8:15 a.m. on the morning of the illegal raid, Elizabeth, Natalia, and their housemates, shackled at their wrists and ankles, were marched out of the house to a van as neighbors and friends stared.  The sisters were not told where they were being taken or why they were being detained.

75.     After boarding the van, Elizabeth asked an agent to help her buckle her seatbelt.  The agent indicated to Elizabeth that she would have to do that herself.  But Elizabeth, Natalia, and the other

detainees were unable to manage the two parts of the seatbelts, as their hands were cuffed, so they were forced to ride without seatbelts.

76. The sisters were transported from Annapolis to an immigration office in Baltimore, where they were locked in a small room with about nine other women.  After several hours, the sisters were each ordered out to sign forms.

77. Elizabeth was escorted to a desk with a female agent who said something in English. Elizabeth was nervous and confused and told the official in Spanish that she did not speak English.  The female agent already had Elizabeth's documents and used them to fill out some forms.  She did not explain what the forms said or their purpose, but she told Elizabeth to sign them.  Elizabeth again protested in Spanish that she did not understand.  The female officer expressed annoyance, and a male officer at a nearby desk looked directly at Elizabeth and said, "fucking Mexicans."

78. A third officer, sitting nearby, approached and told Elizabeth in Spanish that the questions on the forms were about whether she wanted to leave the United States or see a judge first. She told him she wanted to speak to a judge, and he showed her where to sign.  She noticed that this was in a different spot than where the other two officers had tried to make her sign the documents.

79. Natalia was also told to sign documents that she could not read or understand because they were printed in English.  She was so scared that she signed wherever she was told to sign. Elizabeth and Natalia were each then questioned again, and never informed about whether they could speak with an attorney.  After several hours at the facility, Elizabeth and Natalia were ultimately separated.

### (7) **Elizabeth's Transfer to St. Mary's County Detention Center**

80.     At 6:00 p.m., Elizabeth was separated from Natalia and directed out of the building and into another van with a group of six others.  As before, Elizabeth was handcuffed and shackled for the duration of the ride, unable to fasten her seatbelt.

81.     Elizabeth was driven from Baltimore to St. Mary's County, Maryland.  The journey was extremely frightening and unsafe because the driver of the van, a female official, drove very fast for the entire trip, changed lanes erratically, and passed every other car in her path.  Elizabeth and many of the other detainees were jostled around in the van and had trouble keeping their balance.

82.     Several times, the detainees screamed from the back for the van driver to slow down.  The driver ignored them.  She instead variously chatted with the other officer in the front of the van, talked on her cell phone, and smoked for virtually the entire van ride to St. Mary's County.  The van made a dangerous and extremely sharp turn upon its arrival at the next detention facility.

83.     The van arrived in St. Mary's County late that evening, where Elizabeth was photographed, given a clean set of clothes, and taken to a shower area.  She was not allowed to shower on her own, however; instead, her shower consisted of being sprayed with cold water by a female officer.  When she asked about using a phone, the guards replied that there was a pay phone but that she needed a phone card for long-distance calls.  She did not have a phone card, so she could make no calls.

84.     That Wednesday, July 2, 2008, at around 2:00 a.m. – approximately 44 hours after the raid – agents abruptly awoke Elizabeth, gave her the clothes she had worn on the day of the raid, and told her to change back into them.  Once she did so, she was led to a bench where she sat and waited, while handcuffed and shackled, from 2:00 a.m. until approximately 6:00 a.m.  At dawn, Elizabeth was ordered into yet another van, was again unable to fasten her seatbelt, and was taken back to Baltimore.

**(8)  Natalia's Transfer to Easton Detention Center and Pennsylvania Facility**

85.     While Elizabeth was taken to St. Mary's County, Natalia was taken by van to a detention center in Easton, Maryland, where she spent one night, then back to Baltimore for several hours, and finally to an unknown facility some two-and-one-half hours away, which she believed to be in Pennsylvania.

86.     Upon arrival at this second facility, Natalia was put in a room with a cement bed, lacking a bedroll or mattress.  Officers denied her request for a pillow or blanket.  There was no toilet in the room, and when she looked out her window to try to call an officer to ask to use the bathroom, she instead saw a male detainee in a cell across from her exposing himself.  This was more than she could bear, and Natalia broke down and wept.  When she finally located an officer, he responded rudely and made her wait another half hour to use the bathroom.  Natalia was unable to sleep that night.

87.     After one night in that facility, Natalia was handcuffed and again taken back to Baltimore.

**(9)  Texas Detention Facility**

88.     After Natalia spent about one hour at the Baltimore facility, Elizabeth arrived there, and the sisters were then handcuffed and shackled once again, taken to an airstrip, and told they were being flown to Texas to see a judge because no judges were available locally.  Natalia, Elizabeth, and about 150 others boarded a plane and were flown to El Paso, Texas.  They were shackled throughout the entire flight, and guards even refused to unhook their shackles and belts when they attempted to use the bathroom on the flight.

89.     After arriving at the Texas facility around 6:30 p.m. on July 3, 2008 – three-and-one-half days after the raid – Elizabeth, Natalia, and seven or eight other detainees waited in a room for

approximately seven hours, until about 1:00 a.m.  At that time, they were allowed to shower and change into clean clothes.  This was the first time since her detention at St. Mary's that Elizabeth had a shower or clean clothes, and the first time Natalia had access to a shower or a change of clothes since the raid began.  They were taken to a large detention area with twenty beds, where they spent one night without pillows.

90.     After being transferred to another holding area, the sisters spent the next six nights – the first week of many they would spend in this detention facility – sleeping on a piece of simple plastic sheeting on a cold concrete floor, with one blanket each, and no pillow.  At one point, a bed was made available to Natalia, but when the sisters tried to devise a system of taking turns in the bed, the guards stopped them.

91.     Natalia suffered from headaches day and night the entire time she was detained in Texas. She was allowed to see a doctor while detained, but he provided her with just one daily pill, which gave relief for only a few short hours before the headaches returned.

92.     Elizabeth could not manage to keep food down during her entire stay in Texas; nearly every single day, she was sick and vomited.  The only advice that guards offered her was to drink more water, and the only help they offered was a pill that looked like the same one they offered Natalia and that did not help.

93.     Eventually, Elizabeth and Natalia were told by other detainees that they could ask to see a lawyer.  Immediately after learning this, they informed guards that they wanted to exercise this right. Elizabeth and Natalia met with an attorney fairly soon thereafter, who met with a judge on their behalf at two hearings.  Several weeks later, Elizabeth and Natalia were informed that their case had been transferred back to Maryland.  They were flown to Pennsylvania and finally released on bond.

94.     In the end, Elizabeth and Natalia spent approximately 56 days at the Texas facility, and 62 days in detention overall.  They were never informed by immigration officials that they could hire an attorney, and they contacted an attorney only after fellow detainees in Texas had advised them of that right.  At no time were they informed by government officials of the purpose of their detention.  The only information provided to Elizabeth and Natalia by the government was written in English, a language they did not understand.

    **(10) <u>Impact on Natalia and Elizabeth</u>**

95.   As a direct result of the foregoing events, Elizabeth has suffered and continues to suffer severe, recurrent major depressive disorder and posttraumatic stress disorder, according to her treating psychologist.  Her experiences during the raid and in detention have also caused her to suffer from depression accompanied by somatic effects including digestive problems, headaches and dizziness, appetite change, intense anxiety, nightmares including those about the sexual assaults, insomnia and sleep disturbance, and visual and auditory flashbacks.

96.   Elizabeth's depression became so severe that on January 24, 2009, feeling hopeless and powerless, in a moment of desperation, she intentionally ingested prescription medication in an amount more than ten times her prescribed daily dosage.  A friend called 911, and Elizabeth was treated at Franklin Square Hospital and kept there for two days.

97.     Elizabeth felt so wronged by the sexual assaults against her that she reported them promptly.  On July 23, 2008, while still detained by ICE, Elizabeth filed a complaint by telephone with the Annapolis Police Department (Case No. 08-004587).

98.   Also as a result of these events, Natalia has suffered and continues to suffer from severe emotional distress.  She has received psychological therapy to attempt to work through the emotions and

fear from the raid and suffers from major depressive disorder, trauma-based anxiety, intense

hypervigilance, social avoidance, and severe insomnia, according to her treating psychologist.  The raid

also caused her to suffer from mood swings that cause her to uncontrollably break down in tears, and she

trembles at the sight or sound of police officers or sirens.

99.    Upon information and belief, it is anticipated that, in addition to their current treatment,

Elizabeth and Natalia are both in further need of psychotherapy.

**(11) Judge Williams' Findings of "Egregious" Constitutional Violations**

100.    On August 5, 2010, United States Immigration Judge Phillip T. Williams granted

Elizabeth and Natalia's motion to suppress evidence obtained through the raid and found that

Defendant's agents committed "egregious" constitutional violations.

101.    In reaching this conclusion, Judge Williams made a number of specific findings,

including the following:

a.    The ICE agents entered Elizabeth and Natalia's bedroom "without a warrant, without

consent, and without the presence of exigent circumstances";

b.    "[T]he added factor of inappropriate sexual contact renders the Fourth Amendment

violation [suffered by Elizabeth] 'egregious,'" and Natalia "was not immune to the

situation of stress and duress created by the male ICE official's offensive touching of

her sister";

c.    Because Elizabeth was wearing small pajama shorts with no pockets and a t-shirt, it

was "unlikely that the ICE agent was simply frisking [Elizabeth] based on a

reasonable belief that she was concealing a weapon";

d.  Because the male ICE officer had watched Elizabeth change into jeans, it is more likely than not "that his subsequent touching of [Elizabeth] in the hallway was not based on a reasonable belief that [Elizabeth] had anything concealed";

e.  Natalia "observed the male ICE officer touching her sister in an offensive, sexual manner" all while Natalia herself was still "in bed clothing similar to that of her sister, consisting of small shorts and a t-shirt";

f.  "The inappropriate touching of [Elizabeth] by the male ICE agent, while she was in her bedroom clothing, is offensive and shocking to the conscience of any reasonable person";

g.  The male agent's "behavior occurred while he was acting in his official capacity"; and

h.  The male agent's conduct "would lead any reasonable person to believe that she was not free to object and had to comply with the demands of the officials conducting the search and seizure." *See In re Gallegos-Torres; In re Palaez-Torres*, at 16-18 (Baltimore, Md. Immigr. Ct., Aug. 5, 2010) (Ex. A).

102.    Judge Williams further stated:  "Having had the opportunity to observe [Elizabeth and Natalia's] demeanor throughout those proceedings and in the context of the background documents offered, the Court finds specifically that both Respondents have testified credibly." *Id.* at 16.

103.    These findings of fact and conclusions of law were actually determined in the proceedings before Judge Williams and were a critical and necessary part of his decision, which is a valid, final, appealable decision.

104.    Defendant was a party to the proceedings before Judge Williams, had a full and fair opportunity to litigate these issues, and actually did litigate these issues, arguing before Judge Williams that there had been no violation of Elizabeth and Natalia's Fourth or Fifth Amendment rights, submitting a declaration describing the plans for the raid, and cross-examining Elizabeth and Natalia regarding the events of the raid.  *See id.* at 9-10, 13-16.

**D.  Pervasiveness of Illegal and Abusive Acts During ICE Raids**

105.    The raids of Plaintiffs' homes are part of a larger, pervasive pattern and practice of unlawful raids conducted by DHS and its ICE agents.

106.    The nationwide pattern and practice of unlawful raids of the type Plaintiffs experienced have been the subject of widespread reporting as well as multiple lawsuits filed in other federal district courts.  *See, e.g.*, Cardozo Immigration Justice Clinic, *Constitution on ICE: A Report on Immigration Home Raid Operations* (2009), *available at* http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/immigrationlaw-741/IJC_ICE-Home-Raid-Report%20Updated.pdf (discussing the nationwide prevalence – and compiling news articles, press releases, and legal papers evidencing the pervasiveness – of constitutional violations occurring during ICE home raids, including ICE agents illegally entering and searching homes and seizing individuals without legal authority).

107.    Abuses by ICE agents in carrying out raids have even been criticized by the United Nations Special Rapporteur on the Human Rights of Migrants.  *See* UN Human Rights Council, *Report of the Special Rapporteur on the human rights of migrants, Jorge Bustamante: addendum: mission to the United States of America*, 5 March 2008, A/HRC/7/12/Add. 2, *available at* http://www.unhcr.org/refworld/docid/47d647462.html.  The Special Rapporteur "note[d] that the

individual assessment of cases does not appear to be sufficient and that detention policies in the United

States constitute serious violations of international due process standards," including "failing to

promptly inform detainees of the charges against them," "denying detainees access to legal counsel,"

and "unnecessarily detain[ing]" individuals "for prolonged periods without any finding that they are

either a danger to society or a flight risk." *Id.* at 10, 12.  The Special Rapporteur reported accounts from

victims of raids that ICE officials "entered their homes without a warrant, denied them access to lawyers

or a phone to call family members, and coerced them to sign 'voluntary departure' agreements." *Id.* at

17.

108.    Courts have also found that Defendants' agents committed tortious and unconstitutional

acts during immigration raids of homes that were similar to those the Plaintiffs experienced.  *See, e.g.*,

*Flores-Morales v. George*, No. 07-cv-0050, slip op. at 10-12 (M.D. Tenn. July 11, 2008) (denying

defendants' motion for summary judgment in part because questions of facts existed as to voluntariness

of plaintiffs' consent for ICE agents to enter their homes);  *Arias v. ICE*, No. 0:07-cv-01959-ADM-JSM

(D. Minn. July 17, 2009) (denying motion for summary judgment because questions of fact existed

regarding whether plaintiff consented to officers' entry); *In the Matter of R-B-* (New York, N.Y.

Immigr. Ct., May 28, 2009) (finding ICE agents' conduct during 5:30 a.m. raid – including excessive

force, entering respondent's home and private bedroom armed with pistols, forcing respondent to stand

in the hallway in his underwear before family members, and refusing to "produce a warrant or identify

the person they claimed to be seeking" – constituted "egregious" and "fundamentally unfair"

constitutional violations).

109.    Complaints filed in federal courts throughout the country further reflect ICE's

widespread practices of conducting raids like those that Plaintiffs experienced.  These complaints

include allegations of illegal searches and seizures being conducted through intimidation, coercion, and force, in abusive and humiliating fashion. *See, e.g.*, *Arias*, No. 0:07-cv-01959-ADM-JSM (D. Minn. Apr. 19, 2007) (alleging that "agents required Plaintiffs dressed in night clothes to change in front of the agents"); *Argueta v. ICE*, No. 2:08-cv-01652 (D.N.J. June 8, 2009) (alleging pattern of raids in which "an occupant simply opens the door in response to the pounding, assuming an emergency. Once the door is opened, the agents enter the home, without properly identifying themselves, and without obtaining an occupant's consent" and agents looking for certain targets nonetheless "interrogate the [other] occupants about their own identities and status, without reasonable basis for believing that they are not United States citizens"); *Aguilar v. ICE*, No. 07-cv-8224 (S.D.N.Y. Sept. 20, 2007) (alleging that in the pre-dawn and early morning hours, agents terrified sleeping residents by "pound[ing] on and/or break[ing] down doors and windows while screaming as loudly as possible . . . . When the unsuspecting residents have the opportunity to open the door to inquire about what is going on, the agents then burst into the homes without first obtaining the occupants' consent to entry"); *Mancha v. ICE*, No. 06-cv-2650 (N.D. Ga. Nov. 1, 2006) (alleging that agents entered U.S. citizen-plaintiffs' homes and property, detained plaintiffs, threatened them, used excessive force, and interrogated them about whether they were "illegals" or "Mexicans" – all without warrants, consent, exigent circumstances, or probable cause).

110.    Given the prevalence of these unlawful raids, Plaintiffs and similarly situated persons may well be subject to similar tortious and unconstitutional treatment in the future.

**COUNT I**

UNLAWFUL SEARCH AND SEIZURE

111.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

112.     Defendant's agents, acting without a warrant, without consent, and without probable cause, performed an unlawful search of and seizure within the home of Plaintiffs Pablo Alvarado and Ingrid Muñoz, in violation of the couple's rights under the Fourth Amendment to the United States Constitution.

113.     As a direct and proximate result of Defendant's actions, Mr. Alvarado and Ms. Muñoz have suffered and continue to suffer irreparable injuries.

114.     As there is no adequate legal remedy, Mr. Alvarado and Ms. Muñoz are entitled to declaratory and injunctive relief.

115.     Defendant's agents, without consent, without probable cause, and with a facially defective warrant, performed an unlawful search of and seizure within the bedroom of Plaintiffs Elizabeth Gallegos-Torres and Natalia Pelaez-Torres, in violation of the sisters' rights under the Fourth Amendment to the United States Constitution.

116.     As a direct and proximate result of Defendant's actions, Ms. Gallegos-Torres and Ms. Pelaez-Torrez have suffered and continue to suffer irreparable injuries.  As there is no adequate legal remedy, Ms. Gallegos-Torres and Ms. Pelaez-Torrez are entitled to declaratory and injunctive relief.

## COUNT II

### UNREASONABLE AND/OR EXCESSIVE FORCE

117.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

118.    Defendant's agents used unreasonable and/or excessive force against Plaintiffs Elizabeth Gallegos-Torres, Natalia Pelaez-Torres, and Pablo Alvarado, in violation of Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

119.    As a direct and proximate result of Defendant's actions, Ms. Gallegos-Torres, Ms. Pelaez-Torres, and Mr. Alvarado have suffered and continue to suffer irreparable injuries.

120.    As there is no adequate legal remedy, Ms. Gallegos-Torres, Ms. Pelaez-Torres, and Mr. Alvarado are entitled to declaratory and injunctive relief.

## COUNT III

### DEPRIVATION OF PROCEDURAL DUE PROCESS

121.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

122.    Defendant's agents deprived Plaintiffs Elizabeth Gallegos-Torres and Natalia Pelaez-Torres of their liberty without due process of law, in violation of the Fifth Amendment.  Defendants used information obtained from the sisters involuntarily and through coercion to deprive them of their liberty, without providing them the opportunity to be heard in a meaningful time and in a meaningful manner.

123.    As a direct and proximate result of Defendant's actions, Ms. Gallegos-Torres and Ms. Pelaez-Torres have suffered and continue to suffer irreparable injuries.  As there is no adequate legal remedy, Ms. Gallegos-Torres and Ms. Pelaez-Torres are entitled to declaratory and injunctive relief.

**COUNT IV**

DEPRIVATION OF SUBSTANTIVE DUE PROCESS

124.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

125.     Defendant's conduct against all Plaintiffs shocks the conscience and is fundamentally unfair under the totality of the circumstances, in violation of Plaintiffs' rights under the Fifth Amendment to the United States Constitution.  As a direct and proximate result of Defendant's actions, all Plaintiffs have suffered and continue to suffer irreparable injuries.  As there is no adequate legal remedy, all Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT V**

ASSAULT

126.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

127.     Defendant's agents, motivated by malice, threatened all Plaintiffs with harmful or offensive touching, possessed the apparent present ability to carry out those threats, and created in the minds of all Plaintiffs an apprehension of imminent bodily harm.

128.     As a direct and proximate result of these actions, all Plaintiffs have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

**COUNT VI**

BATTERY

129.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

130.     Defendant's agents, motivated by malice, engaged in intentional, unpermitted touchings of Plaintiffs Elizabeth Gallegos-Torres and Pablo Alvarado.  These touchings were harmful or offensive to Ms. Gallegos-Torres and Mr. Alvarado.

30

131.     As a direct and proximate result of these actions, Plaintiffs Elizabeth Gallegos-Torres and Pablo Alvarado have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

## COUNT VII

### SEXUAL ASSAULT

132.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

133.     Defendant's agent, motivated by malice, engaged in intentional, unpermitted touchings of Ms. Gallegos-Torres in a sexual manner that were harmful and offensive to her.

134.     As a direct and proximate result of these actions, Plaintiff Elizabeth Gallegos-Torres has suffered and continues to suffer severe and lasting emotional distress, and is entitled to compensatory damages.

## COUNT VIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

135.     Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

136.     Defendant's agents, motivated by malice, intentionally or recklessly engaged in extreme and outrageous conduct against Plaintiffs Elizabeth Gallegos-Torres, Natalia Pelaez-Torres, and Pablo Alvarado.

137.     As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiffs Elizabeth Gallegos-Torres, Natalia Pelaez-Torres, and Pablo Alvarado have suffered and continue to suffer severe emotional distress and are entitled to compensatory damages.

**COUNT IX**

TRESPASS

138.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

139.    Defendant's agents, using physical acts or force, motivated by malice, and without consent or legal authority, interfered with Plaintiffs Elizabeth Gallegos-Torres and Natalia Pelaez-Torres's possessory interest in their bedroom.

140.    Defendant's agents, using physical acts or force, motivated by malice, and without consent or legal authority, interfered with Pablo Alvarado and Ingrid Muñoz's possessory interest in their home.

141.    As a direct and proximate result of these actions, Plaintiffs Elizabeth Gallegos-Torres, Natalia Pelaez-Torres, Pablo Alvarado, and Ingrid Muñoz have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

**COUNT X**

FALSE IMPRISONMENT

142.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

143.    Defendant's agents, motivated by malice, and without consent or legal authority, deprived all Plaintiffs of their liberty.

144.    As a direct and proximate result of these actions, all Plaintiffs have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

## COUNT XI

### INVASION OF PRIVACY

145.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

146.    Defendant's agents, motivated by malice and in a highly offensive manner, intruded upon the solitude and seclusion of all Plaintiffs in their private affairs and concerns.

147.    As a direct and proximate result of Defendant's actions, all Plaintiffs have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

## COUNT XII

### NEGLIGENCE

148.    Plaintiffs incorporate by reference all preceding allegations as if fully set forth herein.

149.    Defendant's agents, despite owing all Plaintiffs a duty of care, acted negligently and recklessly.

150.    As a direct and proximate result of Defendant's negligent and reckless actions, all Plaintiffs have suffered and continue to suffer severe and lasting emotional distress, and are entitled to compensatory damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court provide the following relief:

A.    Declare that Defendant and its agents violated the Fourth and Fifth Amendments to the United States Constitution;

B.    Issue an order enjoining Defendant from undertaking any future raids conducted in similarly tortious manner or in violation of the Fourth and Fifth Amendments to the United States Constitution, including, but not limited to:

    a.   Enjoining Defendant and its agents from entering residences, seizing individuals and/or searching their homes through the use of force, intimidation, and/or coercion and without a valid warrant, consent, or exigent circumstances;

    b.   Enjoining Defendant and its agents from detaining, searching, and/or interrogating individuals who are not the targets of the raid and not identified with particularity in a warrant supported by probable cause as to each individual;

    c.   Enjoining Defendant and its agents from using evidence in immigration removal proceedings that has been obtained through violation of the Constitution;

    d.   Enjoining Defendant and its agents from committing abusive and humiliating practices during raids;

    e.   Requiring Defendant to implement policies to ensure that raids are carried out lawfully and are free from abusive practices and unlawful discrimination, by, for example, using home raids as an enforcement or investigatory tactic of last resort, videotaping home raids, conducting periodic training and issuing guidance in home raid procedures, and implementing other measures the Court finds appropriate.

C.    Award Plaintiffs actual, compensatory damages, including economic and non-economic damages against Defendant, in the amount of FOUR HUNDRED THOUSAND DOLLARS ($400,000) to Pablo Alvarado, ONE HUNDRED THOUSAND DOLLARS ($100,000) to Ingrid Muñoz, ONE MILLION, SIX THOUSAND, FOUR HUNDRED FIFTY-EIGHT DOLLARS ($1,006,458) to Elizabeth Gallegos-Torres, and FIVE HUNDRED THOUSAND DOLLARS ($500,000) to Natalia Pelaez-Torres;

D.    Award Plaintiffs reasonable costs and attorneys' fees incurred in bringing this action;

E.      Award Plaintiffs pre-judgment and post-judgment interest as allowed by law; and

F.      Award such other and further relief as the Court may deem appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury as to any and all claims allowable.

DATED: June 28, 2011                    Respectfully submitted,

                                        _____/s/_____

                                        Kathleen Clair (Bar Number 18143)
                                        kclair@crowell.com
                                        Arash Jahanian (Bar Number 18149)
                                        ajahanian@crowell.com
                                        Laurel Malson (*of Counsel*)
                                        lmalson@crowell.com
                                        CROWELL & MORING LLP
                                        1001 Pennsylvania Avenue, N.W.,
                                        Washington, DC 20004-2595
                                        Telephone: 202-624-2500
                                        Facsimile: 202-628-5116

                                        – and –

                                        Enid Gonzalez Aleman, Esq. (*of Counsel*)
                                        CASA DE MARYLAND, INC.
                                        8151 15th Avenue
                                        Hyattsville, MD 20783
                                        Telephone: 240-491-5716
                                        Facsimile: 301-408-4123
                                        egonzalez@casamd.org

                                        *Attorneys for Plaintiffs Pablo Alvarado, Ingrid
                                        Muñoz, Elizabeth Gallegos-Torres, and Natalia
                                        Pelaez-Torres*